IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SYLVIA AVALOS, Individually,
and as Personal Representative of the
ESTATE OF ADAM AVALOS and in
her capacity as Parent and Next Friend
of ARIEL AVALOS and ADAM AVALOS, JR.,

          Plaintiff,

vs.                                                                  No. CIV 06-0836 RB/LAM

BOARD OF COUNTY COMMISSIONERS
OF DOÑA ANA COUNTY, NEW MEXICO,
and CHRIS BARELA and DUNCAN BLACKBURN,
in their individual capacities,

          Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** came before the Court on Defendants' Motion for Summary Judgment (Doc. 48), filed on March 8, 2007, and Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 76), filed on April 18, 2007. Jurisdiction arises under 28 U.S.C. §§ 1331, 1343, and 1367. Having considered the submissions of counsel, relevant law, and being otherwise fully advised, I find that these motions should be denied.

I.     **Background.**

On April 2, 2006, Adam Avalos[1] ("Mr. Avalos") was killed by Dominic Montoya ("Mr. Montoya") while both men were inmates at the Doña Ana County Detention Center ("DACDC") in Las Cruces, New Mexico. Plaintiff, the surviving spouse of Mr. Avalos, brought this action for

---

[1] Avalos was the brother of Jesse Avalos, who was convicted of the January 1998 murder of Carly Martinez, an 18-year-old freshman at New Mexico State University. ([Doc. 49] Def. Ex. F, Luna Dep. 79-80.) The Carly Martinez case received a great deal of publicity in Las Cruces during the late 1990s and early 2000s. ([Doc. 49] Def. Ex. F, Luna Dep. 80.) Jesse Avalos is currently serving a 92-year sentence with the New Mexico Department of Corrections.

money damages on behalf of herself and the minor children of Plaintiff and Mr. Avalos.  In her

Second Amended Complaint[2], Plaintiff alleges violations of 42 U.S.C. §1983 for cruel and unusual

punishment and deprivation of due process against Defendant Blackburn (Count I), Defendant

Barela (Count II), and the County (Count III), as well as negligent operation of the detention facility

(Count IV), negligence causing enumerated torts (Count V), and loss of consortium (Count VI).

Defendants assert: 1) the individual defendants are entitled to qualified immunity; 2) absence

of municipal liability, 3) the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to 27

("NMTCA"), bars the negligence claims, and 4) New Mexico law does not recognize a separate

cause of action for loss of consortium.

## II.    Facts.

The following statement of facts is set forth in the light most favorable to Plaintiff, with all

reasonable inferences from the record drawn in her favor.  *See Fuerschbach v. Southwest Airlines

Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006).

### A.    The roles of the individual defendants at DACDC.

At the time of the incident, April 2, 2006, Defendant Chris Barela ("Mr. Barela") served as

the administrator of DACDC.  In 2001, Mr. Barela began working at DACDC as the captain in

charge for support operations. ([Doc. 77] Def. Ex. A, Barela Aff. ¶¶ 2, 3.)  In 2002/2003, Mr. Barela

was reassigned to the Operations Division where he managed the day-to-day activities of DACDC,

including supervising the individual departments of security, classification, and dispositions.  ([Doc.

77] Def. Ex. A, Barela Aff. ¶ 4.)  Mr. Barela was appointed administrator of DACDC in December

---

[2] After Defendants filed their first Motion for Summary Judgment (Doc. 48), on March 8, 2007, the parties
agreed to an extension of time for Plaintiff to respond.  The Second Amended Complaint was filed on April 4, 2007.
Subsequently, Defendants filed a second motion for summary judgment on behalf of the individual defendants
named in the Second Amended Complaint.  The original summary judgment motion was neither amended nor
withdrawn.  Both motions for summary judgment are addressed herein.

2005.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 5.)

On April 2, 2006, Defendant Duncan Blackburn ("Officer Blackburn") served as the disciplinary officer at DACDC.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 2.)  Officer Blackburn began working at DACDC in 2000 as a floor officer.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 10.)  As a floor officer, Officer Blackburn rotated between control pods and had rover responsibilities.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 10.)

After working as a floor officer for two years, Officer Blackburn served as a transport officer for a year and a half, before moving into the classification office in 2003 or 2004.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 10-11.)  In the classification office, Officer Blackburn served as disciplinary officer.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 26.)

From August 2005 through April 2006, Officer Blackburn served as the disciplinary officer at DACDC.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 2.)  As disciplinary officer, Officer Blackburn was responsible for reviewing incident reports on a daily basis, determining the past history of inmates, gathering information and witness statements for the DACDC disciplinary board, maintaining disciplinary files, documenting the findings of the disciplinary board, and following through with any sanctions imposed by the disciplinary board.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 12-13; 15; 26; [Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 2-3.)

Officer Blackburn met with inmates in "Supermax," who were housed in Bravo Pod, and with inmates in "Maximum," who were housed in Fox Pod, on a daily basis to observe inmate behavior, obtain reports, address concerns and evaluate whether inmates were complying with sanctions and rules.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 6.)  Officer Blackburn met with inmates in Charlie Pod on a weekly basis to monitor their behavior.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 6.)  In his investigations, Officer Blackburn was watchful for indications of gang

activity in incident reports.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 4.)

Officer Blackburn testified in his deposition that an absence of incident reports concerning an inmate would indicate an improvement in compliance and attitude for that inmate.  ([Doc. 81] Pl. Ex. 4, Blackburn Dep. 61.)  However, Officer Blackburn elaborated in his affidavit that any finding of marked improvement as to Mr. Montoya was based on Officer Blackburn's daily interactions with Mr. Montoya, other inmates, and officers in charge of monitoring Mr. Montoya, as well as the absence of any incident reports. ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶¶ 17-18.)

Officer Blackburn testified in his deposition that he believed administrative segregation was justified only to protect vulnerable or suicidal inmates.  ([Doc. 81] Pl. Ex. 4, Blackburn Dep. 34.)

### B.     Configuration of DACDC.

During August 2005 through April 2006, DACDC was organized into the following pods: "A" Pod was medical; Bravo Pod was Supermax and general population; Charlie Pod-1 was a transitional medium security unit; Charlie Pod-2 housed inmates charged with sex offenses; Delta Pod housed medium security inmates; Echo Pod housed female inmates; Fox Pod housed maximum custody level inmates, including those housed in administrative segregation; Gulf Pod housed minimum and medium security inmates; and X-Ray Pod housed federal medium security inmates. ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 4.)

Supermax was the most restrictive custody level; inmates were in handcuffs and shackles when out of their cells.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 4.)  Inmates in Fox Pod were supposed to be locked in their cells 23 hours per day and let out into the day room one at a time for showers and phone calls.[3]  ([Doc. 81] Pl. Ex. 3, Madden Dep. 39.)

---

[3] As more fully discussed in Section II G, this level of security may not have been uniformly enforced in Fox Pod.

Mr. Avalos was killed in the shower area of Delta 4, one of the four day rooms within Delta Pod. ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 45.)  Inmates in each day room could mingle with inmates in the same day room. ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 45.)  Each day room contained a shower area.  ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 45.)  The officer stationed in the Delta Pod control room, which controlled the four Delta Pod day rooms, had difficulty monitoring inmates in Delta Pod due to blind spots.  ([Doc. 80] Pl. Ex. 5, Pando Dep. 23-26.)  It was impossible to see inside the shower areas from the Delta Pod control room.  ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 45-46.)

Defendant Blackburn testified in his deposition that the control room officer could monitor the shower areas via speakers with poor sound quality, provided the speakers were turned on.  ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 46.)  However, control room officers were trained to turn on the speakers only if the officer believed suspicious activities were afoot in the shower areas. ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 46.)  Officer Blackburn was aware that a "large amount" of assaults occurred in the shower areas prior to the incident in this case.  ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 48.)

### C.    Razor Distribution Policy at DACDC.

Floor officers distributed disposable razors to inmates on Wednesday and Sunday evenings at about 9:00 or 9:30 p.m.  ([Doc. 49] Def. Ex. E, Pando Dep. 59-60.)  Floor officers were trained to count and check the razors when distributing and retrieving them.  ([Doc. 80] Pl. Ex.5, Pando Dep. 20-21.)  Officers who retrieved the razors were instructed to check to make sure the blades were in place. ([Doc. 80] Pl. Ex.5, Pando Dep. 20-21.)  DACDC personnel were aware that inmates were known to remove the blades and replace them with foil from the linings of potato chip bags. ([Doc. 80] Pl. Ex.5, Pando Dep. 20-21.)

### D.    Classification and Reclassification of Inmates at DACDC.

DACDC uses a program known as the "Jail Inmate Classification System" ("JICS"), to assess the level of risk presented by an inmate. ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 9.) JICS is a software program that uses a "decision tree" based on such factors as the inmate's prior criminal record and current charges in order to classify the inmate. ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 10; ([Doc. 49] Def. Ex. D, Madden Dep. 28-33.) DACDC uses the JICS program to classify inmates during initial classification and any subsequent reclassification. ([Doc. 77] Def. Ex. A, Barela Aff. ¶12.) Inmates at DACDC are housed according to the custody level categorized by JICS, unless the classification officer seeks an override from a supervisor. ([Doc. 77] Def. Ex. A, Barela Aff. ¶¶ 14, 15.)

Pursuant to DACDC policy, inmates are classified within 48 to 72 hours of arrival at DACDC. ([Doc. 49] Def. Ex. D, Madden Dep. 24-25; 28.) JICS requires the classification officer to consider prior convictions, known criminal history, gang affiliation, and current charges to determine the appropriate level of custody for an inmate. ([Doc. 49] Def. Ex. B, Blackburn Dep. 25.) In order to assess these factors, the classification officer reviews the inmate's current charges and the inmate's prior criminal history as reported in the inmate's NCIC[4] report. ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 13; ([Doc. 49] Def. Ex. D, Madden Dep. 28-33.) The NCIC report is necessary for classification of the inmate. ([Doc. 49] Def. Ex. B, Blackburn Dep. 24.)

Inmates housed at high classification levels are reviewed every 30 to 45 days using the JICS program. ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 16.) One of the factors considered in reclassification of an inmate is improved behavior and compliance with rules. ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 17.) If an inmate's behavior does not improve, the inmate may be reclassified to a higher level of

---

[4] NCIC reports contain the criminal history of an inmate and are run prior to classification of an inmate at DACDC. ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 24.)

custody.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 18.)

Inmates who are at risk in general population are classified for protective custody if they meet all the requirements of protective custody.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 30.)  Inmates housed in protective custody are usually those with law enforcement backgrounds or who are accused of child sex offenses.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 31.)

DACDC maintains a main file on each inmate, which is known as the inmate's "jacket." ([Doc. 49] Def. Ex. D, Madden Dep. 6-7.)  Documents used in classification are kept in the jacket. ([Doc. 49] Def. Ex. D, Madden Dep. 6-7.)  A new jacket is opened for each instance of detention at DACDC.  ([Doc. 49] Def. Ex. D, Madden Dep. 44.)  Jackets are maintained in the classification office.  ([Doc. 49] Def. Ex. D, Madden Dep. 44.)  Classification officers generally do not have access to jackets created for prior instances of detention.  ([Doc. 49] Def. Ex. D, Madden Dep. 44.)

If an inmate has disciplinary issues, the disciplinary officer[5] creates a separate, disciplinary file on the inmate, which is maintained by the disciplinary officer.  ([Doc. 49] Def. Ex. D, Madden Dep. 7; ([Doc. 49] Def. Ex. B, Blackburn Dep. 25.)

### E.    Disciplinary Policies at DACDC

DACDC inmates who fail to follow policies and procedures and/or commit additional criminal acts while in custody are subject to disciplinary actions.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 19.)  Criminal acts are reported to the Doña Ana County Sheriff's Office for investigation. ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 20.)

DACDC policy requires officers to prepare reports on anything out of the ordinary, including disciplinary matters, pod unrest, verbal altercations between inmates, medical matters, and

---

[5] Officer Blackburn was the DACDC disciplinary officer at all times relevant to this case.

noncompliant behavior.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 14.)  The officer writing the report was required to categorize the incident as a Level 1 , 2 ,or 3.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 16.)

Level 1 and Level 2 offenses can lead to a criminal investigation and also administrative action by the disciplinary board.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 22.)  Level 3 offenses usually are handled by the reporting officer utilizing administrative disciplinary measures.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 22.)  The reports are prepared on the computer system and are available for immediate access by officers at DACDC.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 15.)

The disciplinary officer may refer Level 3 reports back to the shift supervisor to discuss whether the report should be raised to a higher level.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 16-17.) After the disciplinary officer reviews and investigates Level 1 and 2 reports, he usually refers such reports to the disciplinary board, which consists of an upper-level DACDC officer, such as a lieutenant, captain, or major.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 23; [Doc. 49] Def. Ex. B, Blackburn Dep. 16-17.)

After receiving testimony and other evidence, if applicable, the disciplinary board makes a finding of appropriate disciplinary action.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 24.)  The inmate may appeal the decision of the disciplinary board to the captain in charge of operations, or the administrator, who will either concur or disagree with the board.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 25.)

If serious sanctions, such as confinement in maximum security, are issued, the disciplinary board sets the length of the sanction based on the violation category.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 26.)  After the inmate serves the sanction, the inmate is reclassified at a lower level and stepped down to a transitional unit before being placed in general population.  ([Doc. 77] Def. Ex.

A, Barela Aff. ¶ 27.)

The transitional unit is used to assess the particular inmate's behavior in a less restrictive level of custody after disciplinary or special management segregation.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 28.)  If the inmate's behavior has improved, the inmate is transferred back to the same level of custody as originally classified after a period of time in the transitional unit.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 29.)

### F.   Detention and Classification of Mr. Avalos.

On March 24, 2006, Mr. Avalos was booked into DACDC for a probation violation and/or failure to report to his probation officer.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 53.)  While Mr. Avalos was in booking, he persistently talked to other inmates and whistled at female inmates.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 54.)  Booking Sergeant Anthony Eberwine ordered Mr. Avalos to stop misbehaving several times to no avail.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 53.)

Sergeant Eberwine called Officer Blackburn and requested permission to place Mr. Avalos in Fox Pod.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 53.)  Officer Blackburn was asked if Officer Blackburn had any disciplinary files on Mr. Avalos from Mr. Avalos' prior detentions at DACDC.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 120.)

Officer Blackburn obtained past reports from the DACDC computer system consisting of a threat by Mr. Avalos against another inmate and some other minor infractions during prior instances of detention at DACDC.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 120.)  Officer Blackburn relayed the information to Sergeant Eberwine.  ([Doc. 49] Def. Ex. B, Blackburn Dep. 120.)  Due to Mr. Avalos' behavior and past history during prior instances of detentions at DACDC, Officer Blackburn approved the move and Mr. Avalos was placed in Fox Pod.  ([Doc. 49] Def. Ex. C-2,

Madden Dep. Ex. 53; [Doc. 49] Def. Ex. D, Madden Dep. 39.)

The booking sheet noted Mr. Avalos was affiliated with a gang known as the "8 Ball Posse." ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 53.)  Officer Blackburn did not believe that membership in the 8 Ball Posse posed a risk of gang retaliation to Mr. Avalos because Officer Blackburn believed the 8 Ball Posse was more known for its drug use than for violence.  ([Doc. 77] Def. Ex. C., Blackburn Dep. 121.)

On March 30, 2006, Officer Nancy Madden classified Mr. Avalos to "4-Medium" and assigned him to Delta 4.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 54.)  Officer Madden acknowledged the classification was outside the 48-to-72 hour policy for classification, but she explained that Mr. Avalos had been placed into Fox Pod, a more secure facility than the booking area, and staff suspected Mr. Avalos had given heroin to another inmate in Fox Pod.  ([Doc. 49] Def. Ex. D, Madden Dep. 25.)  Moreover, receipt of Mr. Avalos' NCIC report had been delayed.  ([Doc. 49] Def. Ex. D, Madden Dep. 25.)  When Madden received Mr. Avalos' NCIC report, she classified him as 4-Medium.  ([Doc. 49] Def. Ex. D, Madden Dep. 28.)

Mr. Avalos was classified as 4-Medium because Madden determined that Mr. Avalos had three prior felony convictions within the prior ten years.  ([Doc. 49] Def. Ex. D, Madden Dep. 33-34; 39.)  However, Mr. Avalos further qualified for 4-Medium based on an APO (Adult Probation Office) hold as well as past and present institutional behavior problems.  ([Doc. 49] Def. Ex. D, Madden Dep. 34.)  Institutional behavioral problems include failing to follow orders and threatening other inmates.  ([Doc. 49] Def. Ex. D, Madden Dep. 35-36.)

### G.    Detention, Classification and Discipline of Mr. Montoya.

On July 30, 2005, Mr. Montoya was booked into DACDC on a charge of strong-armed robbery.  (Def. Ex. C-1, Blackburn Ex. 25.)  Mr. Montoya's booking documents included charges

or prior convictions for: murder, attempted murder, breaking and entering, armed robbery, resisting arrest, transport of a deadly weapon, possession of a firearm or destructive device by a felon, and evading or obstructing an officer. ([Doc. 80] Pl. Ex. 1B.)

On August 4, 2005, Mr. Montoya was classified into "2-close custody," a subcategory of maximum security, because he was charged with an assaultive felony and had prior assaultive felony convictions.  (Def. Ex. C-1, Blackburn Dep. Ex. 27.)

On August 31, 2005, Mr. Montoya's custody level was reviewed, at Mr. Montoya's request, and Mr. Montoya was re-classified 3-medium high custody, a subcategory of medium security, based on mitigating circumstances and a marked improvement in compliance and attitude.  (Def. Ex. C-1, Blackburn Dep. Ex. 28.)  Mr. Montoya was moved to a medium-custody pod.

Approximately two weeks later, on October 17, 2005, Mr. Montoya and Inmate Claudio Casteñeda assaulted Inmate Jerome Ruelas in Gulf Pod.  (Def. Ex. C-1, Blackburn Dep. Ex. 30.) Officer Blackburn investigated the incident.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 15.)  On October 21, 2005, the disciplinary board gave Mr. Montoya 30 days lock down in Supermax for this assault.  (Def. Ex. C-1, Blackburn Dep. Ex. 30.)  Ruelas was taken for medical care and moved to another pod.  (Def. Ex. C-1, Blackburn Dep. Ex. 30.)  Mr. Montoya was placed in Supermax.

On November 20, 2005, Officer Blackburn reclassified Mr. Montoya due to Mr. Montoya's marked improvement in compliance and attitude adjustment based on Officer Blackburn's daily interactions with Mr. Montoya and conversations with officers regarding Mr. Montoya's behavior. ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 17.)  If there were no reports regarding a particular inmate, Officer Blackburn found that the inmate had satisfactorily completed his sanction or was in compliance with DACDC rules.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 18.)  Mr. Montoya was "stepped down" in custody level to Fox Pod and subsequently moved to a medium-custody pod.

11

([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 16.)

Less than two weeks later, on December 1, 2005, Mr. Montoya was accused of threatening Inmate Ermino Olivo in Gulf Pod.  (Def. Ex. C-1, Blackburn Dep. Ex. 34.)  Inmate Olivo was moved, and Mr. Montoya was locked down for the rest of the night.  (Def. Ex. C-1, Blackburn Dep. Ex. 34.)

On December 16 or 17, 2005, Mr. Montoya, and eleven other inmates in Delta Pod, were accused of beating Inmate Noel Garrucha and tearing up his legal paperwork.  (Def. Ex. C-1, Blackburn Dep. Ex. 35;  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 19.)  An investigation determined that Inmate Garrucha was attempting to extort money from inmates and promising legal assistance on pending criminal matters.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 19.)

Inmate Garrucha was taken for medical care and relocated to a different pod, the day room was placed on pre-disciplinary lock down, and the television was turned off.  ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 35.)  Officer Blackburn determined there was no information substantiating Inmate Garrucha's claim that a physical altercation occurred and no discipline was imposed on any of the inmates involved.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 20.)

On January 4, 2006, Officer Roberto Pando witnessed Mr. Montoya beat Inmate Leonard Flores with a broom handle in Charlie Pod.  ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 36.)  Inmate Flores had only one arm.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 88.)  Mr. Montoya and Inmate Flores were sitting at a day room table with other inmates when Mr. Montoya got up, retrieved the broom, and started hitting Inmate Flores.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 88-89.)  Mr. Montoya chased Inmate Flores around the day room and into Inmate Flores' cell.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 88-89.)

Responding officers encountered Mr. Montoya with a broken broom handle in his hand,

yelling at Inmate Flores through his cell window.  ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 36; [Doc. 77] Def. Ex. C, Blackburn Dep. 89.)  Officers found Inmate Flores in his cell "with blood running down his rear head area."  ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 36.)  Pieces of broken broom handle were retrieved from the floor.  ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 36.)  Inmate Flores was taken to the hospital for stitches.  ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 36.)  Mr. Montoya was rehoused in Fox Pod.  ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 36.)

On January 8, 2006, Mr. Montoya threatened staff by saying "you remember what happened in Delta Pod," shouted profanities, and shouted at Officer Jose Gonzales to open the door so Montoya could "kick his ass." ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 39.)

On January 10, 2006, Mr. Montoya was reclassified to "1-maximum" and placed in Supermax for 30 days due to the Flores beating. ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 36.) After he completed the 30 days in lock down, Mr. Montoya was stepped down to Fox Pod.  ([Doc. 49] Def. Ex. C-1, Blackburn Dep. Ex. 36; [Doc. 77] Def. Ex. B, Blackburn Aff. ¶¶ 21-22.)

On January 30, 2006, DACDC received an order for a confidential forensic psychological evaluation of Mr. Montoya.  ([Doc.81] Pl. Statement of Undisputed Facts ¶ 28.)[6]

On February 3, 2006, Officer Blackburn reclassified Mr. Montoya to "3-medium." ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 41.)  On February 10, 2006, Mr. Montoya, while housed in Fox Pod, refused to take recreation, continually pushed his intercom button, and called Officer Jeffrey Hinojos and other DACDC officers "pussies."  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 41; ([Doc. 77] Def. Ex. C, Blackburn Dep. 106.)  Mr. Montoya was not disciplined in connection

---

[6] Defendants do not directly dispute this factual statement set out by Plaintiff, but state that it is incomplete. Defendants assert that the mere fact that a competence evaluation is ordered does not necessitate a finding of any mental health issues.  ([Doc.84] Defs. Reply 4-5.)  The forensic evaluation is not included in the record.

13

with this incident.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 108.)

On February 22, 2006, while housed in Charlie Pod, Mr. Montoya and other inmates refused officers' directives to lock down.  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 42.)  Mr. Montoya was placed in pre-disciplinary lock down.  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 42.)  On February 28, 2006, Mr. Montoya was found guilty by the disciplinary board of malingering and disorderly conduct and given time-served in lock down.  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 44.)  Mr. Montoya was subsequently rehoused with medium security inmates.

On March 18, 2006, in Delta Pod, Officer Raymond Lindsey heard Inmate Casteñeda shout at Inmate Christopher Aguilera that "[Inmate] Oscar [Cruz] ran off cause he was afraid we would fuck him up."  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 45.)  As Inmate Casteñeda shouted these words, Mr. Montoya waived his fist over his head, bounced on his toes, and said "yeah." ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 45.)  Mr. Montoya was not disciplined in connection with this incident.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 110-11.)

On March 19, 2006, in Delta Pod, Officer Lindsay reported that Mr. Montoya was involved in an incident where inmates refused to approach the intercom when signaled to do so.  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 46.)  Mr. Montoya was not disciplined in connection with this incident.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 114.)

On March 20, 2006, Officer Scott Ronquillo reported that Mr. Montoya was demanding and disrespectful to him.  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 47.)  When told to back up, Mr. Montoya threatened Officer Ronquillo by stating "show up in the shower tonight!"  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 47.)  Officer Ronquillo and Officer Kelly rehoused Mr. Montoya in Fox Pod for threatening staff.  ([Doc. 49] Def. Ex. C-2, Blackburn Dep. Ex. 47.)

Between March 24 and March 30, 2006, Mr. Avalos and Mr. Montoya were housed in Fox

14

Pod together.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 25.)

On March 27, 2006, Officer Josuah Fleming observed Inmate Robert Fernandez ("Inmate Fernandez" or "Fernandez"), another Fox Pod inmate, displaying odd behavior.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)   Around 6:00 p.m., Officer Fleming received a call from Inmate Fernandez's father, who reported that Inmate Fernandez had been sexually assaulted.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)

Officer Fleming inquired of Inmate Fernandez, but Inmate Fernandez asked to speak to Officer Fleming in private.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)  Later that evening, after Officer Fleming had Inmate Fernandez brought to his office, Inmate Fernandez recounted several "different broken short stories," which led Officer Fleming to believe that Fernandez was under the influence of some kind of drug.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)

Inmate Fernandez explained to Officer Fleming that Mr. Avalos had slipped Fernandez some "chiva" (heroin) in his coffee.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)  Inmate Fernandez stated that Mr. Avalos had "done some fucked up shit" to Fernandez in his cell that Fernandez "did not deserve."  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)  Inmate Fernandez further related he had not had a bowel movement all day because he wanted to preserve evidence.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)

During the interview by Officer Fleming, Inmate Fernandez made vague references that his brother, Inmate Jerry Fernandez, knew what happened, and that four people were in his cell.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 53.)  The incident included allegations that both Mr. Avalos and Mr. Montoya sexually assaulted Inmate Fernandez after Mr. Avalos gave heroin to Inmate Fernandez.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 25.)

Officer Fleming reported the incident to the Doña Ana County Sheriff's Office.  ([Doc. 49]

Def. Ex. C-2, Madden Dep. Ex. 55.)  A search of Mr. Avalos' cell yielded no contraband.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)  Officer Fleming included all of the above information in a report.  ([Doc. 49] Def. Ex. C-2, Madden Dep. Ex. 55.)  An investigation concluded that there was insufficient evidence to substantiate the allegations.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 25.)  Neither Mr. Montoya nor Mr. Avalos were disciplined in connection with the Fernandez incident.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 118.)

Officer Blackburn heard a rumor that Mr. Avalos had asked for a syringe, Mr. Montoya provided Mr. Avalos with a syringe, and Mr. Avalos was high while both Mr. Avalos and Mr. Montoya were housed in Fox Pod in late March 2006.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 117-18.)  Officer Blackburn passed the information along to the floor lieutenants, who conducted cell searches and found nothing.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 118.)  Neither Mr. Montoya nor Mr. Avalos were disciplined in connection with the heroin rumor.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 118.)

On March 31, 2006, Mr. Montoya was moved to Delta Pod, where Mr. Avalos had been housed since March 30, 2006.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 115-16.)

### H.    Events of April 2, 2007.

Officer Richard Ybarra started working at DACDC on March 31, 2006 and was assigned to the Delta Pod control room.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 14.)  The duties of a patrol room officer entailed watching the inmates, reporting any sort of emergency, and controlling doors.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 25.)  Officer Ybarra worked the 5:00 p.m. to 5:00 a.m. shift on March 31, 2006 and April 1, 2006 without incident.  ([Doc. 49] Def. Ex. A, Ybarra Dep 20-21.)

On April 2, 2006, Officer Ybarra reported for work at about 4:50 p.m. for his pre-shift briefings.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 24.)  At the briefings, Officer Ybarra was informed

that an inmate in Delta Pod 3 was on pre-disciplinary lock down and razors were scheduled to be distributed to inmates that night at around 9:00 p.m.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 23-25; 34.)

The shift started normally.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 32.)  The evening meal was served around 6:00 p.m. or 6:30 p.m. without incident.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 32.)  Nothing was out of the ordinary.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 54.)  Inmates were walking around, making phone calls, asking for toilet paper, and asking Officer Ybarra questions.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 54.)

Mr. Montoya interacted normally with the other inmates.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 55-56.)  Inmates Mr. Montoya, Jaime Ceballos, and Casteñeda were in a group together as they often were.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 57.)  Inmate Casteñeda asked Officer Ybarra for a razor blade on at least one occasion.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 59.)  Razors were not passed out that night.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 59.)

Between 7:50 p.m. and 8:00 p.m., as Officer Ybarra finished writing a report on the pre-disciplinary inmate in Delta 3, he noticed very few inmates were in the Delta 4 day room.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 32-33; 37.)  Upon closer inspection, Officer Ybarra noticed Mr. Montoya sitting on a table in the day room, covered in blood.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 37.)  Most of the other inmates were in their cells, but some were on the phone or watching TV, trying to ignore the situation.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 37.)  Officer Ybarra rang the buzzer to signal the inmates to prepare to lock down and radioed a "Code Mary," which is a possible medical emergency.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 40; Def. Ex. E, Pando Dep. 43.)  Mr. Montoya did not move.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 40.)

Other officers, including Officer Pando and Sergeant Paco Luna, responded and entered the Delta 4 day room.  ([Doc. 49] Def. Ex. A, Ybarra Dep. 41; Def. Ex. F, Luna Dep. 83.)  Mr. Montoya

17

was sitting on a day room table with a blood soaked towel around his neck with blood from his face down his arms and shirt. ([Doc. 49] Def. Ex. E, Pando Dep. 45; Def. Ex. F, Luna Dep. 84.)  Mr. Montoya was rocking back and forth and he appeared disoriented and unresponsive.  ([Doc. 49] Def. Ex. E, Pando Dep. 45; Def. Ex. F, Luna Dep. 84.)  The officers handcuffed Mr. Montoya and placed him in a restraining chair to facilitate the investigation.  ([Doc. 49] Def. Ex. F, Luna Dep. 85.)  Mr. Montoya struggled and spit on the officers as they restrained him.  ([Doc. 80] Pl. Ex. 5, Pando Dep. Ex. 12.)

Officer Pando found Mr. Avalos in the shower area, face up in a pool of blood, neither breathing nor bleeding.  ([Doc. 49] Def. Ex. E, Pando Dep. 47-48; [Doc. 80] Pl. Ex. 5, Pando Dep. Ex. 12 .)  Mr. Avalos had a two-inch gash on the right side of his neck, an ear was severed, and he had approximately eleven lacerations on his face, chest and legs.  ([Doc. 49] Def. Ex. E, Pando Dep. 47; [Doc. 80] Pl. Ex. 5, Pando Dep. Ex. 12; [Doc. 80] Pl. Ex. 6.)  Mr. Avalos was pale and his eyes were yellow.  ([Doc. 49] Def. Ex. E, Pando Dep. 47.)  Written in blood on the wall were the words "Will she love me?" along with the letters "F" and "D" and several hearts.  ([Doc. 49] Def. Ex. E, Pando Dep. 49; [Doc. 80] Pl. Ex. 5, Pando Dep. Ex. 12 .)

A razor blade of the type normally affixed to the handle of a shaver was found in a toilet near the body.  ([Doc. 81] Pl. Ex. 6.)

None of the other inmates in Delta 4 had cuts or blood on them.  ([Doc. 80] Pl. Ex. 5, Pando Dep. Ex. 12.)  Inmate Ceballos reported to Officer Pando that Mr. Montoya had been walking around or sitting on the day room table covered in blood for about 30 minutes before officers arrived.  ([Doc. 80] Pl. Ex. 5, Pando Dep. Ex. 12.)

## I.    Evidence concerning knowledge of Defendants.

Defendant Barela knew about Mr. Montoya's behavior based on incident reports, but Mr.

Barela believed the disciplinary actions adequately addressed Mr. Montoya's behavior.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 35.)  Mr. Barela stated in his affidavit that he did not believe that Mr. Avalos was at risk of harm from Mr. Montoya while housed in the same pod or day room.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 38.)

Mr. Barela was unaware that Mr. Avalos was the brother of Jesse Avalos.  ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 34.)  Mr. Barela was aware that Mr. Avalos had been an inmate at DACDC on a number of occasions, but he was unaware of any risk posed to Mr. Avalos while housed at DACDC. ([Doc. 77] Def. Ex. A, Barela Aff. ¶ 34.)

Between August 2005 and April 2006, Officer Blackburn met with Mr. Montoya on a number of occasions.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 14.)  Officer Blackburn did not believe Mr. Montoya suffered from any mental health issues.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 14.)

Officer Blackburn testified in his deposition he did not have access to Mr. Montoya's NCIC report and was unaware of his past violent felony convictions.  ([Doc. 77] Def. Ex. B, Blackburn Aff. ¶ 26.)  This testimony conflicts with Officer Madden's deposition testimony that NCIC reports were run on each inmate as a prerequisite to classification and such reports were kept in the inmate's jacket.  ([Doc. 49] Def. Ex. D, Madden Dep. 6-7; 24.)

Despite the existence of Officer Fleming's report on the Fernandez incident, Officer Blackburn testified in his deposition that he had no knowledge of allegations that Mr. Avalos had abused another inmate during his stay at DACDC in March and April 2006.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 119-20.)  Officer Blackburn testified in his deposition that he had no information regarding any threats to Mr. Avalos and he did not know that Mr. Avalos was the brother of Jesse Avalos until after Mr. Avalos was killed.  ([Doc. 77] Def. Ex. C, Blackburn Dep. 120-21.)

19

While Officer Madden was aware that Mr. Avalos was the brother of Jesse Avalos, she did not believe that this fact increased Mr. Avalos' risk of injury. ([Doc. 49] Def. Ex. D, Madden Dep. 41.) Officer Madden was unaware of any memorandum concerning any threat posed to Mr. Avalos by a prison gang. ([Doc. 49] Def. Ex. D, Madden Dep. 42.) Officer Madden did not believe that Mr. Avalos' affiliation with the 8 Ball Posse presented any particular risk of harm to Mr. Avalos. ([Doc. 49] Def. Ex. D, Madden Dep. 42.)

Before the incident, Officer Ybarra had no knowledge about the backgrounds of Mr. Avalos or Mr. Montoya. ([Doc. 49] Def. Ex. A, Ybarra Dep. 20-21; 60.) Officer Ybarra had access to information concerning the basis for detention and reports that were made within the facility, but he was not encouraged to look into the background of inmates. ([Doc. 49] Def. Ex. A, Ybarra Dep. 20.)

Officer Pando testified in his deposition he was unaware that Mr. Avalos was at risk for any reason. ([Doc. 49] Def. Ex. E, Pando Dep. 59.) Mr. Montoya had always been respectful to Officer Pando. ([Doc. 49] Def. Ex. E, Pando Dep. 59.) However, Officer Pando was aware that Mr. Montoya posed a risk to other inmates. ([Doc. 49] Def. Ex. E, Pando Dep. 59.) Officer Pando believed that Mr. Montoya was "violent, unpredictable . . . [and] "kind of insane[,] violent insane." ([Doc. 80] Pl. Ex. 5, Pando Dep. Ex. 12.)

Sergeant Luna testified in his deposition he knew Mr. Avalos growing up because their families were friends. ([Doc. 49] Def. Ex. F, Luna Dep. 78.) Sergeant Luna had broken up fights between Mr. Avalos and other inmates. ([Doc. 49] Def. Ex. F, Luna Dep. 78.) Mr. Avalos had cursed at Sergeant Luna and verbally threatened him a couple of times. ([Doc. 49] Def. Ex. F, Luna Dep. 79.)

Sergeant Luna testified in his deposition he remembered reading a memorandum from the

Department of Corrections that a prison gang was after Jesse Avalos and his family.  ([Doc. 49] Def. Ex. F, Luna Dep. 79.)  Sergeant Luna recalled that the memo indicated that Jesse Avalos had become involved with a prison gang known as Los Carnales.  ([Doc. 49] Def. Ex. F, Luna Dep. 80.)  Another prison gang, the SNM (Sindicato New Mexico), had disputes with Los Carnales and wanted Jesse Avalos, or any family member of Jesse Avalos, hurt. ([Doc. 49] Def. Ex. F, Luna Dep. 80.)  Sergeant Luna believed that the memo came down around the time Jesse Avalos was sentenced in 2000. ([Doc. 49] Def. Ex. F, Luna Dep. 81.)  The memo may have been received as a result of the work of a gang task force that had been discontinued by 2006.  ([Doc. 49] Def. Ex. F, Luna Dep. 82.)

Sergeant Luna recalled that, during a prior detention at DACDC, Mr. Avalos was housed in the observation area, or in a pod with no SNM members. ([Doc. 49] Def. Ex. F, Luna Dep. 80.)  Sergeant Luna did not see anything regarding the memo in Mr. Avalos' jacket for his last stay at DACDC.  ([Doc. 49] Def. Ex. F, Luna Dep. 81.)

Sergeant Luna knew that Mr. Avalos was a member of the 8 Ball Posse based on his jacket. ([Doc. 49] Def. Ex. F, Luna Dep. 82.)  Sergeant Luna did not see any information concerning gang affiliations in Mr. Montoya's jacket, but Sergeant Luna did notice Mr. Montoya talked with verified SNM gang members.  ([Doc. 49] Def. Ex. F, Luna Dep. 82.)

**J.      Plaintiffs' Expert Witness: Thomas A. Rosazza.**

In his report of March 8, 2007, Plaintiff's expert witness, Thomas A. Rosazza opined that DACDC officials failed to provide a safe environment for Mr. Avalos by failing to classify Mr. Montoya properly and failing to separate Mr. Montoya from medium security inmates, and jail staff failed to properly supervise Mr. Avalos and Mr. Montoya on April 2, 2006.  ([Doc. 80]  Pl. Ex. 1B.)

Mr. Rosazza found that Mr. Montoya was known to DACDC managers and staff as a

predator with both a violent criminal history and an institutional history of violence and threatening behavior.  ([Doc. 80] Pl. Ex. 1B.)  According to Mr. Rosazza, Mr. Montoya's criminal history and behavior at DACDC warranted maximum control and separation from non-violent inmates, especially medium security inmates. ([Doc. 80] Pl. Ex. 1B.)

Mr. Rosazza found it significant that Mr. Montoya was initially classified as "2-Close" (maximum), the second highest security level of general population classification. ([Doc. 80], Pl. Ex. 1B.)  However, just 27 days later, Mr. Montoya was reduced to "3-Medium High" with what Mr. Rosazza considered insufficient justification.  ([Doc. 80] Pl. Ex. 1B.)

Mr. Rosazza observed that, on January 10, 2006, Mr. Montoya was reclassified to "2 Maximum" as a result of the assault on Flores.  ([Doc. 80] Pl. Ex. 1B.)  Mr. Montoya was given 30 days in disciplinary lock down.  ([Doc. 80] Pl. Ex. 1B.)  However, just 24 days later, on February 3, 2006, Mr. Montoya was reclassified medium security with no justification other than a check-off on the classification form noting "Marked Improvement in Compliance. Attitude Adjustment." ([Doc. 80] Pl. Ex. 1B.)  Mr. Rosazza found this justification to be insufficient given Mr. Montoya's criminal history and recent institutional behavior. ([Doc. 80] Pl. Ex. 1B.)

In Mr. Rosazza's opinion, DACDC's tolerance of Mr. Montoya's threats toward staff encouraged violent behavior and created a dangerous environment for staff and inmates.  ([Doc. 80] Pl. Ex. 1B.)  While the JICS provided for a maximum security assignment for Mr. Montoya, the system was not followed at DACDC.  ([Doc. 80] Pl. Ex. 1B.)  Moreover, even if the DACDC classification policy resulted in a medium security classification, Mr. Montoya's behavior toward inmates and staff was sufficient to justify an override to maximum security.  ([Doc. 80] Pl. Ex. 1B.)

The jail classification system provided for non-disciplinary administrative segregation, but classification staff did not use it and managers failed to enforce policies to ensure its use for

predators such as Mr. Montoya.  ([Doc. 80] Pl. Ex. 1B.)  The failure to use non-disciplinary administrative segregation left jail managers without a viable option to control predators and contributed to a dangerous environment for general population inmates.  ([Doc. 80] Pl. Ex. 1B.)  Mr. Rosazza believes that DACDC managers failed to properly supervise the work of classification staff and override the decisions to classify Mr. Montoya as medium security.  ([Doc. 80] Pl. Ex. 1B.)

According to Mr. Rosazza, the industry standard of care required officers to be posted in or immediately adjacent to housing units and to be able to see or hear in order to respond promptly to emergency situations.  ([Doc. 80] Pl. Ex. 1B.)  The fact that the officer stationed in the Delta Pod control room could neither see into the shower area, nor was trained to adequately monitor sounds in that area, fell below the standard of care in the field of corrections.  ([Doc. 80] Pl. Ex. 1B.)

## III.   Standard.

Summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is appropriate "only where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Fuerschbach*, 439 F.3d at 1207 (quoting Rule 56(c)).  The evidence, and all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  If this burden is met, the nonmovant must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could

find for the nonmovant." *Id.* (citations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995). The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The Court may consider only admissible evidence on summary judgment. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995).

When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to show (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred. *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003) (citing *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000) and *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)). If the plaintiff does not satisfy either portion of this two-pronged test, the Court must grant the defendant qualified immunity. *Verdecia*, 327 F.3d at 1174 (citing *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001)).

## IV.     Discussion.

### A.     Plaintiff's Objections to Defendants' Exhibits are overruled.

Plaintiff objects to Defendants exhibits designated as ( Doc. 49) Ex. C-1 and (Doc. 77) Ex. D on the ground that Defendants failed to establish the admissibility of such exhibits. "At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible." *Bryant v. Farmers Ins.*

24

*Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) (citation omitted).

The documents at issue were produced by Officer Blackburn at his deposition, pursuant to a subpoena duces tecum issued by Plaintiff's counsel, who examined Officer Blackburn about several of the documents.   ([Doc. 80] Pl. Ex. 4, Blackburn Dep. 64-66; 110-11; 113; 116.) Defendants' exhibits designated as ( Doc. 49) Ex. C-1 and (Doc. 77)  Ex. D may be considered for summary judgment purposes given that Defendants could easily authenticate these documents at trial.

Plaintiff further objects to Defendants' exhibits on the grounds that Defendants' exhibits exceed the 50-page limit established by D.N.M.LR-Civ. 10.5, and Defendants failed to highlight their exhibits as required by D.N.M.LR-Civ. 10.6.

Defendants attached 111 pages of exhibits to their Memorandum in Support of Motion for Summary Judgment (Doc. 49), filed on March 8, 2007, and 86 pages to their Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 76), filed on April 18, 2007.  Defendants also failed to highlight the portions of the exhibits they wanted to bring to the Court's attention.[7]  In their reply brief, Defendants requested leave to exceed the page limitation.

Defendants should have requested leave to exceed the page limitation as required by D.N.M.LR-Civ. 10.5.  The absence of highlighting increased the amount of time required to review the exhibits and contributed to the delay in resolving these motions.  However, Plaintiff has had an adequate opportunity to respond to the exhibits and this matter is fully briefed.  In the interest of judicial economy, I find that permission to exceed the page limitation should be granted to Defendants nunc pro tunc.  Defendants are admonished to follow the Local Rules in all future

---

[7] Plaintiff's counsel complied with the page limitation for exhibits and highlighted her exhibits as required by D.N.M.LR-Civ. 10.6.

filings.

**B.      Defendants' requests to strike the opinions of Mr. Rosazza are denied.**

At the conclusion of their reply briefs, Defendants request that the opinions of Mr. Rosazza be stricken, pursuant to Fed. R. Evid. 702 and 703, on the ground that Plaintiff submitted the exhibit without previously qualifying Mr. Rosazza as an expert.  (Doc. 82 at 9; Doc. 84 at 9-10.)

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  The party proffering the expert testimony bears the burden of proving by a preponderance of the evidence that the expert's testimony is admissible pursuant to Rule 702.  *See, e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (citations omitted).

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

As interpreted by the Supreme Court, Rule 702 requires that an expert's testimony be both reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that it will assist the trier in determining a fact in issue.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-92 (1993).  To assist in the assessment of reliability, the Court in *Daubert* identified four nonexclusive factors that a trial court may consider: (1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific

community.  *Daubert*, 509 U.S. at 593-94.

The Court has emphasized that this list is neither definitive nor exhaustive and that the district court has wide discretion, both in deciding how to assess an expert's reliability and in making a determination of that reliability.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999).  The Court has described the district court's role in determining the admissibility of expert opinions as a "basic gatekeeping obligation."  *Kumho Tire*, 526 U.S. at 147.  The objective of the gatekeeping obligation is "to ensure the reliability and relevancy of expert testimony . . . . to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id*.  The focus should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions.  *Daubert*, 509 U.S. at 595.

Mr. Rosazza holds a bachelor of arts degree in an unspecified major, a master's degree in education, and graduate-level work in criminal justice administration.  ([Doc. 80] Pl. Ex. 1A.)  Mr. Rosazza has served as Assistant Warden for the Maryland House of Corrections, Assistant Executive Director of the Maryland Police and Correctional Training Commission, and Executive Director of the Maryland Commission on Correctional Standards.

Mr. Rosazza's resume includes considerable background in jail/corrections management and operations.  Mr. Rosazza's experience adequately qualifies him to testify as an expert on the issues relating to jail/corrections management and operations.  With respect to these matters, Mr. Rosazza's opinions are reliable.

If the reliability prong is met, the court then considers other non-exclusive factors to determine whether the testimony will assist the trier of fact: (1) whether the testimony is relevant; (2) whether it is within the jury's common knowledge and experience; and (3) whether it will usurp

27

the juror's role of evaluating a witness' credibility.  *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006) (quotations omitted).  Essentially, the question is "whether [the] reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 593.  Mr. Rosazza's opinions are relevant and address issues that are not within the jury's common knowledge or experience.  The opinions will not usurp the fact finder's role.  Mr. Rosazza qualifies as an expert witness in jail/corrections management and operations under Rule 702 because the opinions in his report are reliable, relevant, likely to assist the trier of fact, and state more than just lay observations.

### C.      Defendants Barela[8] and Blackburn are not entitled to qualified immunity.

A government official is entitled to qualified immunity from civil damages when his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If, and only if, the court finds that a favorable view of the facts alleged establishes a violation of a constitutional right, the inquiry then proceeds to the next step; whether the right was clearly established at the time of the defendant's alleged unlawful conduct.  *Id*; *see also Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007).

When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to make the initial showing.  *Verdecia*, 327 F.3d at 1174.  The threshold inquiry for qualified immunity

_____

[8]  Defendant Barela's involvement in the incident may be insufficient as a matter of law to support personal liability against him under § 1983.  *See Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996) ("in order to successfully assert a § 1983 claim under the Eighth Amendment for failure to protect, a plaintiff must show personal involvement or participation in the incident.").  As the parties have not briefed this issue, it is not addressed herein.

in this case is whether Plaintiff has made the initial showing that the conduct of Administrator Barela and Officer Blackburn violated the Eighth Amendment. *Id*.

The Eighth Amendment[9] states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. Amend. VIII.  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828-29 (1994) (citing *Helling v. McKinney*, 509 U.S. 25 (1993), *Wilson v. Seiter*, 501 U.S. 294 (1991); and *Estelle v. Gamble*, 429 U.S. 97 (1976)).

The rationale underlying the deliberate indifference standard is the notion that "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' " *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, (1981)).  Accordingly, the Eighth Amendment imposes upon prison officials a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. 833 (citation omitted).

The "deliberate indifference" standard contains both an objective component and a subjective component. *Farmer*, 511 U.S. at 837.  The objective component requires a plaintiff to show that the inmate was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.  With respect to the objective component, the Tenth Circuit has observed:

> There exists no precise definition of those types of conditions of confinement that violate the [objective component] . . . . Such conditions have been found to exist where prison officials disregard repeated warnings of danger to a particular prisoner and continually refuse to make the situation safer; for example, by either separating

---

[9] Eighth Amendment standards apply to Mr. Avalos, who was detained on a probation revocation and/or failure to report to his probation officer. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1494 (10th Cir. 1990) (holding that Eighth Amendment standards, rather than due process standards applicable to pretrial detainees, apply to incarcerated persons whose guilt has been adjudicated formally but who await sentencing).  In any event, the legal standards under the Eighth and Fourteenth Amendments are congruous for the purposes of this case. *Berry*, 900 F.2d 1494 n.6.

the prisoner from other inmates who previously have attacked him on multiple occasions, *see Hayes v. New York City Dep't of Corr.*, 84 F.3d 614 (2d Cir. 1996); *Horton v. Cockrell*, 70 F.3d 397, 399 (5th Cir. 1995), or providing adequate safety apparatus on an obviously dangerous machine, *Bagola v. Kindt*, 39 F.3d 779, 780 (7th Cir. 1994).  In such cases, prison officials have a constitutional duty to take reasonable measures to protect prisoners against current threats of attack and other " 'sufficiently imminent dangers' . . . likely to cause harm."  *Horton*, 70 F.3d at 401 (quoting *Helling v. McKinney*, 509 U.S. 25, 34 (1993)).

*Grimsley v. MacKay*, 93 F.3d 676, 681 (10th Cir. 1996).

The subjective component requires that the prison official must have a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 837.  In describing the subjective component, the Court made clear a prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  The subjective component is akin to "recklessness in the criminal law," where, to act recklessly, a "person must 'consciously disregard' a substantial risk of serious harm." *Farmer*, 511 U.S. at 837, 839.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at  842.  In this regard, the *Farmer* Court elaborated:

> If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 843 (quotation omitted).

Plaintiff has presented evidence that Defendants Barela and Blackburn disregarded multiple

30

warnings of danger posed by Mr. Montoya and continually refused to make the situation safer by repeatedly releasing Mr. Montoya from lock down.

Within the six months preceding the killing, Mr. Montoya was involved in two substantiated assaults on other medium security inmates.  Both victims required medical treatment; one inmate required hospital treatment.  Mr. Montoya was implicated in three other assaults of medium security inmates.  Just days before the killing, Mr. Montoya was accused of sexually assaulting an inmate in Fox Pod, which was supposed to be a lock down facility.  In five other instances, Mr. Montoya threatened inmates and DACDC officers and he repeatedly refused to comply with orders from staff.

Viewed in the light most favorable to Plaintiff, a jury could find from the evidence of record that Mr. Montoya posed a substantial risk of serious harm to inmates housed within his grasp, including Mr. Avalos.  A jury could find that Mr. Avalos was confined under conditions posing a substantial risk of serious harm.  Plaintiff has satisfied the objective component of the deliberate indifference standard.

Plaintiff has also satisfied the subjective component.  Based on the evidence of record, viewed in the light most favorable to Plaintiff, a jury could find Defendants Barela and Blackburn were aware of the risk posed by Mr. Montoya and failed to take reasonable precautions to protect Mr. Avalos.  Mr. Montoya's history of assaults on other inmates and threats against staff were longstanding, pervasive, and well-documented.  Defendants Barela and Blackburn were aware of the reports of Mr. Montoya's violent behavior.

Although Blackburn stated in his affidavit that he did not believe Montoya had mental health issues, another officer believed that Montoya was "violent" and "insane."    Blackburn stated he did not have access to Montoya's NCIC report.  However, Officer Blackburn and Officer Madden testified in their depositions that DACDC obtained NCIC reports to classify inmates and the NCIC

31

reports were kept in the inmate's jacket.  Montoya had been classified and repeatedly reclassified.  This suggests that Montoya's jacket contained an NCIC report documenting his violent criminal history that Defendant Blackburn could have reviewed.  Defendant Barela stated in his affidavit that he was aware of Mr. Montoya's disciplinary history at DACDC.  These facts, taken together and viewed in the light most favorable to Plaintiff could result in a jury finding that Defendants Blackburn and Barela were aware of the risk posed by Mr. Montoya to other inmates such as Mr. Avalos.  Plaintiff has satisfied the subjective component of the deliberate indifference standard.

Defendants Blackburn and Barela argue that the subjective component is not satisfied because they had no specific awareness that Mr. Avalos was in danger.  This position is inconsistent with the law.  Such a reading of *Farmer* "would essentially reward guards who put their heads in the sand by making them immune from suit-the less a guard knows the better." *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005).  Simply put, correctional officers need not know the specifics of the danger to be culpable under *Farmer. Id.*

The circumstances suggest that Defendants Barela and Blackburn were exposed to information concerning the risk posed by Mr. Montoya to other inmates.  A jury could infer from this evidence that Defendants Barela and Blackburn were aware of the risk posed by Mr. Montoya to a medium security inmate such as Mr. Avalos.  Viewed in the light most favorable to Plaintiff, the facts of record could result in a jury finding that Defendants Barela and Blackburn acted with deliberate indifference to the safety of Mr. Avalos. Plaintiff has satisfied the first step of the qualified immunity test.

The second step in the qualified immunity analysis is whether the right was clearly established at the time of the individual defendants' alleged unlawful conduct. *Saucier*, 533 U.S. at 201.  The Supreme Court has emphasized:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks and citations omitted).

At the time of the incident, the law was clearly established that detention center officials had a duty to protect inmates from violence inflicted by other prisoners. *Farmer v. Brennan*, 511 U.S. at 833-34. Viewed in the light most favorable to Plaintiff, the facts of record could support a finding that Defendants Barela and Blackburn acted with deliberate indifference. Having so concluded, Defendants Barela and Blackburn are not entitled to qualified immunity.

### D. Defendant County is not entitled to summary judgment on the deliberate indifference claim.

Defendants argue that the County is not liable because there was no constitutional violation. The Supreme Court has held "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 694 (1978).

> A plaintiff may prove the existence of an official policy or custom in at least five ways: (1) the municipality may be liable for a decision by its properly constituted legislative body; (2) an official policy exists when the municipal board or agency exercises authority delegated to it by a municipal legislative body; (3) actions by those with final decision-making authority for the municipality constitute official policy; (4) the municipality may be liable for a constitutional violation resulting from inadequate training when its failure to train the lawless employee reflects a deliberate indifference to the plaintiff's constitutionally-protected rights; or (5) the municipality's custom caused the constitutional violation.

*Darr v. Town of Telluride*, _____ F.3d _____, 2007 WL 2218882 *10 (10th Cir. Aug. 3, 2007).

Municipal liability based on a policy of inadequate training requires proof of the

municipality's "deliberate indifference" to its inhabitants-i.e., the failure to train must "reflect [ ] a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). This deliberate indifference standard, which does not contain a subjective component, may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407-408 (1997)).

As more fully discussed in Section IV D, Plaintiff has presented facts from which a jury could find a policy or custom of inadequate training with deliberate indifference to the safety of inmates sufficient to support a finding of municipal liability. The evidence of record indicates that Defendant DACDC had a practice of failing to segregate dangerous and violent inmates from non-violent inmates. The fact that Mr. Montoya was repeatedly released into the general jail population after assaulting inmates and threatening staff could be construed as reflective of a policy or custom contributing to a constitutional violation. The fact that officers were not trained to monitor the shower areas when it was known that a large number of assaults occurred there could be construed as establishing deliberate indifference to the safety of inmates. The fact that officials did not tighten the razor distribution policy when officers were aware that inmates retained razors[10] could be found to have caused the constitutional violation.

Viewing the facts in the light most favorable to Plaintiff, a jury could find that the policies and customs and/or inadequacy of staff training at DACDC caused an Eighth Amendment violation. Plaintiff has presented sufficient evidence to withstand summary judgment on her municipal liability

---

[10] Plaintiff has presented evidence from which a jury could find that Mr. Avalos was killed with a razor distributed by DACDC.

claim against the County.

        **E.**     **Defendants are not entitled to summary judgment on Plaintiff's negligence claims.**

             **1.**     **Plaintiff has presented sufficient evidence that N.M. Stat. Ann. § 41-4-6 waives immunity for Plaintiff's claim for negligent operation of DACDC.**

Plaintiff alleges Defendants negligently operated DACDC because Mr. Montoya constituted a dangerous condition, Mr. Avalos was at a particular risk of harm, Defendants knew there were blind spots that prohibited observation of the shower area, and Defendants failed to use the speaker system to monitor the shower area. (Second. Am. Compl. ¶¶ 115-120.) Defendants have moved for summary judgment on this claim, arguing the immunity is not waived because the claim is based solely on the classification of Mr. Montoya.

The NMTCA grants all government entities and their employees general immunity from actions in tort, but waives that immunity in certain specified circumstances. *See* N.M. Stat. Ann § 41-4-4. The waiver for "operation or maintenance of any building" constitutes one such circumstance. *See* N.M. Stat. Ann § 41-4-6. This waiver allows individual claims against governmental entities that are based on "the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." *Id.* Maintenance and operation of a correctional facility falls within the waiver afforded by Section 41-4-6. *Callaway v. New Mexico Dep't of Corr.*, 117 N.M. 637, 643, 875 P.2d 393, 399 (Ct. App. 1994).

For Section 41-4-6 to apply, "the negligence must be of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service or the users of the building, including the plaintiff." *Upton v. Clovis Mun. Sch. Dist.*, 140 N.M. 205, 211, 141 P.3d 1259, 1265 (2006). Where the alleged unsafe condition is caused by negligently allowing dangerous

inmates to victimize the general prison population, § 41-4-6 provides a waiver of immunity. *Callaway*, 117 N.M. at 643, 875 P.2d at 399.  However, where the danger is unique to a particular inmate to the point where it is a function of his classification, immunity is not waived by § 41-4-6. *Archibeque v. Moya*, 116 N.M. 616, 621, 866 P.2d 344, 349 (1993).

> The New Mexico Supreme Court recently explained the distinction in *Upton*:

> In *Archibeque*, a prison administrator negligently failed to check a list of names before placing an inmate into an area of the prison with his known enemies. 116 N.M. at 618, 866 P.2d at 346. In declining to equate this with negligent operation of a building under Section 41-4-6 , Chief Justice Ransom noted the difference between cases involving only a "discrete administrative decision" that did not make the premises any more dangerous beyond "the reasonable and expected risks of prison life," and the cases demonstrating "a general condition of unreasonable risk from negligent security practices," for which the NMTCA does waive immunity. *Archibeque*, 116 N.M. at 622, 866 P.2d at 350 (Ransom, J., specially concurring). That general condition later surfaced in *Callaway* when prison officials allowed violent gang members to mingle with the general prison population, thereby creating a dangerous condition based on more than just a single administrative decision affecting only one inmate as in *Archibeque*.  *See Callaway*, 117 N.M. at 643, 875 P.2d at 399.

*Upton v. Clovis Mun. Sch. Dist.*, 140 N.M. 210, 141 P.3d 1264.

> The placement of Mr. Montoya in a medium security pod is more closely aligned to the situation in *Callaway* than the situation in *Archibeque*.  Despite two substantiated assaults on other inmates, four alleged assaults on other inmates, numerous threats to staff, and a violent criminal history, Defendants permitted Mr. Montoya to terrorize the general population of medium security inmates.  Allowing Mr. Montoya to mingle with, and menace, medium security inmates created a dangerous condition that placed other inmates, including Mr. Avalos, at risk of injury.

> Moreover, Count IV is based in part upon the known blind spots in the shower areas and the failure to utilize the speaker system to monitor the shower area.  The New Mexico Supreme Court has embraced a broad view of the "operation or maintenance" aspect of Section 41-4-6 to encourage

the State "to exercise reasonable care to prevent or correct dangerous conditions on public property." *Williams v. Central Consol. Sch. Dist.*, 124 N.M. 488, 491, 952 P.2d 978, 981 (Ct. App. 1997). For purposes of Section 41-4-6, "operation or maintenance" includes negligence in failing to correct a dangerous condition that originated as a design defect or was created when the property was constructed. *Williams v. Central Consol. Sch. Dist.*, 124 N.M. 488, 493, 952 P.2d 978, 983 (Ct. App. 1997); *see also Romero v. Valencia County*, 133 N.M. 214, 216-17, 62 P.3d 305, 307-308 (Ct. App. 2002).

Viewed in the light most favorable to Plaintiff, a jury could find from the evidence of record that the placement of Mr. Montoya with medium security inmates posed a dangerous condition. The evidence indicates that Defendants knew, or should have known, of the dangerous conditions posed by Mr. Montoya, the blind spots in the shower areas, and the failure to utilize the speaker systems to monitor the shower areas. Plaintiff has produced evidence supporting her negligence claim that falls within the waiver provided by Section 41-4-6. Defendants' motion for summary judgment with respect to the applicability of Section 41-4-6 will be denied.

### 2. N.M. Stat. Ann. § 41-4-12 waives immunity for Plaintiff's claim for negligence causing enumerated torts and Plaintiff has presented sufficient evidence to withstand summary judgment on this claim.

In Count V, Plaintiff alleges that the conduct of Defendants and other employees/agents of DACDC constituted negligence causing enumerated torts for which immunity has been waived under N.M. Stat. Ann § 41-4-6. (Second. Am. Compl. ¶¶ 121-124.) Defendants argue that this claim fails because jail staff followed protocol with respect to the distribution of razors, Mr. Montoya and Mr. Avalos were properly classified, and Officer Ybarra acted prudently in his observation of the Delta 4 day room.

Section 41-4-12, the waiver for liability of law enforcement officers, provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann § 41-4-12.

County detention center officers fall within the definition of law enforcement officers for purposes of Section 41-4-12. *Davis v. Bd. of County Comm'rs of Doña Ana County*, 127 N.M. 785, 796, 987 P.2d 1172, 1183 (Ct. App. 1999); *Methola v. County of Eddy*, 95 N.M. 329, 622 P.2d 234 (1980). The officers need not be the direct cause of injury (in the sense of having inflicted it) in order for liability to attach. *Schear v. Bd of County Comm'rs*, 101 N.M. 671, 673, 687 P.2d 728, 730 (1984).

The specific form or classification of negligence is not material under Section 41-4-12 of the NMTCA. *Davis*, 127 N.M. 785, 795-96, 987 P.2d 1172, 1182-83. The only issue with regard to Section 41-4-12 is whether the injured person suffered personal or bodily injury resulting from an assault or battery "caused" by the negligence of law enforcement officers while acting within the scope of their duties. *Davis*, 127 N.M. at 796, 987 P.2d at 1183.

Viewed in the light most favorable to Plaintiff, a jury could find from the evidence of record that Defendants knew, or should have known, of the dangerous conditions posed by Mr. Montoya, of the blind spots in the shower areas, and of the failure to utilize the speaker systems to monitor the shower areas. In addition, the practice of distributing and collecting razors when officers knew that shiny foil from potato chip bags was sometimes substituted for the actual razor upon return may support a finding of negligence. Plaintiff has produced evidence that Defendants' negligence resulted in the assault on Mr. Avalos. Defendants' motion for summary judgment with respect to

the applicability of Section 41-4-12 will be denied.

      **F.    Defendants are not entitled to dismissal of the loss of consortium claims.**

      Defendants assert that Count VI, which consists of loss of consortium claims for Plaintiff and the two children, should be viewed as a measure of damages as opposed to independent claims. Plaintiff responds that the loss of consortium claims are properly pleaded and legally sufficient.

      New Mexico law clearly recognizes independent causes of action for loss of spousal consortium and loss of parental consortium. *State Farm Mutual Auto. Ins. Co. v. Luebbers*, 138 N.M. 289, 299, 119 P.3d 169, 179 (Ct. App. 2005). Loss of consortium is the emotional distress suffered by a person who has an intimate familial relationship with a tort victim. *Lozoya v. Sanchez*, 133 N.M. 579, 587, 66 P.3d 948, 955 (2003); *Romero v. Byers*, 117 N.M. 422, 425, 872 P.2d 840, 843 (1994). The loss to the claimant arises from the foreseeability of damage to the intimate familiar relationship. *Lozoya*, 133 N.M. at 585, 66 P.3d at 954.

      The elements consisting of the qualities of the relationship that give rise to the claim are flexible in scope. *Lozoya*, 133 N.M. at 587, 66 P.3d at 955. The legal availability of relief depends on the factual determination of whether a plaintiff has a significant enough relational bond with the victim of a tort to recover for loss of consortium. *Id*. A cause of action for loss of consortium is separate from a claim for damages for wrongful death. *See Fitzjerrell v. City of Gallup*, 134 N.M. 492, 497, 79 P.3d 836, 841 (Ct. App. 2003).

      Plaintiff has alleged that she is the surviving spouse of Mr. Avalos, and that Ariel Avalos and Adam Avalos, Jr. are the surviving children of Mr. Avalos. Plaintiffs have adequately pleaded the essential elements of their claims for loss of consortium to defeat a dismissal for failure to state a claim. Defendants are not entitled to dismissal of Count VI.

**WHEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 48), filed on

March 8, 2007, and Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 76),

filed on April 18, 2007, are denied.


_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**